UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NORBERT J. KELSEY,

         Petitioner,

                                        Case No. 1:09-cv-1015

v.

                                        Hon. Gordon J. Quist

MELISSA LOPEZ POPE, *et al.*,

         Respondents.

_____/

## REPORT AND RECOMMENDATION

Petitioner has filed a Petition for Writ of Habeas Corpus, pursuant to 25 U.S.C. § 1303.[1]  For the reasons stated below, the petition should be denied.

### I.      Background

Petitioner is an enrolled member of the Little River Band of Ottawa Indians (sometimes referred to as "the Little River Band," "the Band" or "the Tribe") and resides in Copemish, Michigan.  Petition at ¶ 17 (docket no. 1).  He was, at the time the allegations were originally made in this case, also a member of the Little River Band's Tribal Council.  *Id.*  On June 8, 2007, petitioner was served with a complaint and warrant, which charged him with violating two sections of the Tribe's Criminal Offenses Ordinance.  *Id.* at ¶ 52; Complaint and Warrant (docket no. 1-12). Law and Order – Criminal Offenses – Ordinance (docket no. 1-11 at pp. 9, 22-23); Tribal Law Appendix (docket no. 12 at pp. 38, 52-53).

---

[1] The court notes that while the docket sheet categorizes this case as a habeas corpus action brought pursuant to 28 U.S.C. § 2241, petitioner seeks habeas corpus relief under a different statute, 25 U.S.C. § 1303. *See* discussion, *infra*.

Count I alleged that petitioner violated Ordinance § 19.02.c (Sexual Assault) which provides in pertinent part:

1. *Offense*.  A person commits the offense of sexual assault, if he subjects another person to any sexual contact; and

A.  he knows or reasonably should know that the sexual contact is offensive to the victim; or . . .

D.  he is in a position of authority over the victim and used this authority to coerce the victim to submit;  . . .

2.  *Sentence*.  A person convicted of sexual assault may be sentenced to imprisonment for a period not to exceed one year, or a fine not to exceed five thousand dollars ($5,000.00), or both.

§ 19.01.c.  Law and Order – Criminal Offenses – Ordinance (docket no. 1-11 at pp. 9, 22-23); Tribal Law Appendix (docket no. 12 at pp. 38, 52-53)(docket no. 1-11 at p. 23).[2]

Count II alleged that petitioner violated Ordinance § 8.06 (Harassment), which provides in pertinent part:

a. *Offense*.  A person commits the offense of harassment, if:

1.  he knowingly pursues  a pattern of conduct that is intended to annoy, seriously alarm or terrorize another person and which serves no lawful purpose; and

2.  the conduct is such that it would cause a reasonable person to suffer substantial emotional distress.

b. *Sentence*.  A person convicted of harassment may be sentenced to imprisonment for a period not to exceed two months, or a fine not to exceed one thousand dollars ($1,000.00), or both.

§ 8.06. Tribal Law Appendix (docket no. 12 at p. 38).

---

[2] The court notes that Count I states the charging statute as "§ 19.02.c" rather than "§ 19.01.c". According to the Tribal Law Appendix  submitted by the parties, § 19.02 involves the offense of indecent exposure.  *See* § 19.02 (docket no. 12 at p. 53).

The Tribe alleged that petitioner accosted a tribal clinic employee, Heidi Foster, during a tribal elders' meeting held at the Tribal Community Center on July 2, 2005. Pet. at ¶ 55. A two-day bench trial was held in January 2008. *Id.* at ¶ 59. The Tribal Court issued an order of judgment which provided in pertinent part as follows:

> On June 8, 2007, a Complaint was filed against the Defendant, Norbert Kelsey, alleging that the Defendant engaged in the crimes of Sexual Assault in violation of the Tribal Ordinance 03-400-03, Section 19.02, and Harassment under the same Ordinance, Section 8.06.

> \* \* \*

> Based on the evidence presented, through the testimony of the witnesses and exhibits, the following findings were made:

> The dominant issue in this matter is whether the Defendant did commit Sexual Assault on Heidi Foster and whether all the elements of the crime as charged, were met. Ms. Foster wore the same blouse that the Defendant touched on the day of the incident when testifying at the hearing held on January 7, 2008. Ms. Foster testified that the Defendant was standing close enough to her to be touching her shoulder; that he "grabbed my badge and pulled out and looked down my blouse and then he turned around and did it again. The same thing." There was sworn testimony from two eyewitnesses subpoenaed by the prosecution that corroborated her description of the incident.

> The Court finds that by the position of the badge on Ms. Foster (even taking into consideration her rudimentary drawing of her shirt front) the Defendant had to touch Ms. Foster's breasts through her clothing when he pulled the badge away from her person. He did this twice. The Defendant had to know or reasonably should have known that a reasonable person would find this offensive. A partial definition of "reasonable" in Black's Law Dictionary is: "*Fair, proper, just, moderate, suitable under the circumstances. Fit and appropriate to the end in view . . . Thinking, speaking, or acting according to the dictates of reason. Not immoderate or excessive, being synonymous with rational, honest, equitable, fair suitable* [sic]*, moderate, tolerable.*" To touch a woman on her breasts, even if it is on the outside of her clothes , is sexual in nature and most certainly offensive. (Touching the breast area falls under 3.17 <u>*Sexual Contact*</u> in Ordinance 03-400-03.) The Defense said that this must be met for a determination of guilt to be found. The court finds that it has been met.

When asked by the defense why she didn't report the incident immediately she answered: "Because I know who he was . . . a Tribal Council Member." When questioned by the defense as to why she felt she "couldn't report something . . .?" Ms. Foster replied: "Because I know the power he has . . . my livelihood." The victim did feel that the Defendant was in a position of authority over her, as he was an elected official on the Tribal Council.

\* \* \*

The Court finds beyond a reasonable doubt that the sexual assault did occur and did occur as the victim described. The counsel for the Defendant alleged that "I never objected to any abuse of authority." He said he objected to the element of "touching the female breast." The court believes that the victim's breast was touched, albeit, over her clothing. The Court also believes that the victim was intimidated by the Defendant because of his power and position on the Tribal Council. The Court found the Victim to be a highly credible witness with no personal gain to be had from this case.

The second count the Defendant was charged with (harassment) was not established. Each incident that was described by the victim was in a Tribal activity setting. As a Tribal Council member, the Defendant had every right to be at that particular function and as a legislator, it makes good political sense. The court understands that the victim may have felt harassed but there was not enough evidence or testimony for the Court to find that the Defendant actually was harassing the victim.

It is the ORDER of this Court that Mr. Kelsey is GUILTY AS CHARGED of sexual assault. Sentencing shall be set and noticed in the near future.

Order of Judgment (Tribal Ct. Jan. 21, 2008) (docket no. 9 at pp. 24-27).

On February 4, 2008, petitioner was sentenced to six months in jail to be held in abeyance while petitioner complied with probation requirements. Order of Sent. (Tribal Ct. Feb. 4, 2008) (docket no. 9 at p. 29). Petitioner was placed on probation for one year, with the following conditions: pay a $5,000.00 fine; perform four hours of community service per week for one year; and not to speak to any female employees of the Tribe (with some exceptions). *Id.* (docket no. 9 at pp. 29-30). The Tribal Court later entered a partial stay of the judgment pending an appeal to the Tribal Court of Appeals. Order (Tribal Ct. Feb. 19, 2008) (docket no. 9 at p. 31).

Petitioner filed two motions in the Tribal Court of Appeals. One motion sought peremptory reversal of his conviction on the ground that the Tribe did not have criminal jurisdiction over this matter. The other motion sought a remand and to disqualify the presiding trial court judge.

The Tribal Court of Appeals found that the Tribal Court committed error in summarily denying petitioner's motion challenging the court's authority (Tribal Ct. App. June 21, 2008) (docket no. 9 at p. 2). The court characterized this challenge as based on petitioner's assertion that he "just discovered" that the location of the crime, the Tribal Community Center, "was just south of the 'reservation boundary.'" *Id.* (docket no. 9 at p. 3). The court determined that it was being asked to consider a factual argument which was outside of the record and which had no prior judicial determination. *Id.* The Tribal Court of Appeals denied the motions for peremptory reversal and to disqualify the trial judge, but granted the motion to remand. *Id.*

The Tribal Court made the following findings of fact on remand:

> Defendant asserts that this court does not have jurisdiction in this case, thus the conviction of Defendant for the crime of sexual assault should be "reversed" and the case dismissed. This assertion is based upon the belief that since the criminal act took place at the Tribal Community Center which is not located on the tribal reservation per se, it is not Indian country and therefore the Tribal court does not have territorial jurisdiction. Without territorial jurisdiction, Defendant argues, the Court has no subject matter jurisdiction.

> Defendant has provided an extensive Brief which, he states, can support only one conclusion, i.e., since the site of the crime is not on the Reservation, it is not "Indian Country" and it is not a "dependent Indian community," the Tribe, through its Court has no jurisdiction. The preceding definitions come from 18 U.S.C. 1151, the federal Serious Crimes Act. Not until page 23 of this 26 page Brief does Defendant mention the Tribal Constitution, and then only to demonstrate how the Constitution is modified by LRBOI Ordinance No. 03-400-03, art. 4.03.

> The salient facts in this case are as follows:

> Defendant Nobert Kelsey, a member of the Tribal Council, appeared at a Tribal function at the Little River Community Center. While there an incident

between Defendant and a female Tribal employee took place, which led to charges of sexual assault being filed against Kelsey. Defendant was convicted after a bench trial held January 7 and 8, 2008, and sentenced February 4, 2008.

The incident giving rise [to] the criminal charges took place at the [Little] River Tribal Community Center. The victim of the sexual assault was a Native American tribal employee. The Center has been owned in fee by the Tribe for many years, and has been and remains a site of numerous tribal functions and events.

Order denying motion to dismiss for lack of subject matter jurisdiction (Tribal Ct. Aug. 22, 2008)

(docket no. 9 at pp. 33-34).

The Tribal Judge then made the following conclusions of law:

An understanding of "jurisdiction" must start with an understanding of tribal sovereignty. The preamble to the Constitution of the Little River Band of Ottawa Indians states: "As an exercise of our sovereign powers, in order to organize for common good, to govern ourselves under our own laws . . . and to protect our homeland, we adopt this Constitution . . . as the Little River Band of Ottawa Indians."

Article I, Section 1, Territory states: "The territory of the Little River Band of Ottawa Indians shall encompass all lands which are now or hereafter OWNED (emphasis added) by or reserved for the Tribe including . . . all lands which are now or at a later date owned by the Tribe or held in trust for the Tribe or any member of the Tribe by the United States of America.

Section 2 – Jurisdiction Distinguished From Territory. The Tribe's jurisdiction over its members and territory shall be exercised to the fullest extent consistent with this Constitution, the sovereign powers of the Tribe and federal law."

The sovereign nation of the Little River Band of Ottawa Indians has defined for itself where and who shall come under its jurisdiction. Since Defendant is a tribal member, his victim is a Native American, and the site of his crime was a facility owned by the Tribe, this case is clearly within the territorial and subject matter jurisdiction of this Court.

*Id.* (docket no. 9 at p. 34).

Appeal was taken to the Tribal Court of Appeals.  *See* Opinion and Order Regarding Jurisdiction (Tribal Ct. App. Feb, 3, 2009) (docket no. 9 at pp. 5-11).  The Tribal Court of Appeals framed the issue presented as follows:

> Does the Little River Band of Ottawa Indians Tribal Court have criminal jurisdiction in a case when the criminal act occurred in the Tribal Community Center located on land owned by the Tribe, but not within the "reservation" boundaries and not on land held by the U.S. government as "trust" land, during a tribal event and when the Defendant is both a tribal member and a tribal official?

*Id.* (docket no. 9 at p. 6).

The Tribal Court of Appeal's ruling forms the basis of the present federal habeas action.  For that reason, the court will reproduce the court's legal analysis in its entirety:

> Whether the courts of the Tribe have jurisdiction, i.e., authority, over matters is a **threshold** determination, which must be made by the courts in each and every case.  See *Champagne v. The People of the Little River Band of Ottawa Indians*, Case No. 06-178-AP. (This Court's Note: The case caption should actually be: *The People of the Little River Band of Ottawa Indians v. Champagne*.)  The beginning point for any analysis of tribal jurisdiction begins with the **inherent authority** of tribes mange [sic] their internal affairs and domestic relations.  See *Talton v. Mayes*, 163 U.S. 376 (1896).  In fact, federal Indian law recognition of such inherent authority is well established and long-standing in the law.  The next step is to look for any limitations  that may have been placed upon that inherent authority.

> Defendant argues that the Tribal Community Center is not located within "Indian country" as that term is defined by 18 USC 1151.  Defendant characterized the present issue as "a very simple, textbook criminal jurisdiction issue."  The vehemence of his argument is exceeded only by its misdirection.  Defendant has submitted numerous federal cases which define the parameters of "Indian country for the purposes of determining whether **federal courts** have **federal criminal jurisdiction** of crimes committed on such lands.  That analysis has nothing to do with whether tribal courts have tribal criminal jurisdiction.  **After diligent research of authorities, this Court cannot find any federal limitation over the exercise of tribal criminal authority over crimes committed by Indians on land which is owned in fee by the Tribe.**

> It is common knowledge that the Tribal Community Center has been the center of Tribal community activities ever since it was purchased by the Tribe many years ago.  In fact, this very Court conducted several hearings in those facilities

when the Tribal courts were first established and this is where the Tribal court offices were located for many years. Thus, it is imperative that judicial notice be taken of the **tribal nature** of all the activities that have occurred at the Community Center over many years now. In addition, the Center is a community gathering point to host varied and numerous tribal meetings, to serve community meals and to provide tribal office space for the conduct of the business of a tribal sovereign.

Criminal law simply put is the mere imposition of standards of behavior by defining that behavior which is unacceptable to the society, i.e. community, of people. It is clear to this Court that the Tribe's standards of behavior **ought** to apply to the behavior of Tribal members and other Indians in the Tribal Community Center. The general welfare of the Tribe depends upon individuals deferring from behavior that offends community standards. The interests of the Tribe are very strong here. This case involves a tribal member in an elected position acting as an agent of the Tribe at a Tribal activity who committed a crime against a Tribal employee in a public setting openly visible to other employees and Tribal members who were present. It also involves a Tribal Court finding that Defendant exercised political influence affecting the victim and the Tribe's welfare. It is sad that the present Defendant is a member of the Tribal Council, who in an effort to escape accountability, argues that the Tribe does not have sovereign authority to hold him accountable to his violation of Tribal standards of behavior. The people should expect that Tribal officials will always work to protect and promote tribal sovereignty, especially their elected **representatives**.

Nonetheless, the Court must consider whether the Tribe itself has imposed a limitation on the exercise of its inherent authority. Thus, we begin an examination of tribal law. Article I of the Tribal Constitution defines the "territory" of the Little River Band of Ottawa Indians as ". . . *all lands which are now or hereinafter owned by or reserved for the Tribe* . . ." (bold added for emphasis by this Court). <u>See</u> *The Constitution of the Little River Band of Ottawa Indians*, Article I, Sec. 1. In fact, the provision includes a **mandate** that such lands "**shall**" be included in the definition. A constitutional mandate is a mandate of the people of the Band because the Tribal Constitution, as the organic governing document of the Tribe, is their collective consent to be governed and it provides their framework for government. The design is mandated.

Section 2 of that same Article requires that "[*t*]*he jurisdiction over its members and territory shall be exercised to the fullest extent consistent with this Constitution, the sovereign powers of the Tribe, and federal law*." (bold added again for emphasis by this Court). Defendant argues that this Section which distinguishes jurisdiction from territory means that tribal jurisdiction is not synonymous with its territory. We agree, but reach a different conclusion that Defendant would have us reach. Defendant's conclusion is that tribal jurisdiction is **smaller** than its territory because the Tribe cannot exercise criminal jurisdiction over the land it owns in fee.

Defendant makes this argument despite the **express** words used in the People's definition of "territory" cited above. However, this Court recognizes that tribal jurisdiction is **larger** than territory because some tribal authority extends beyond its land, e.g., tribal membership and self-regulation of tribal treaty rights within treaty ceded areas. The drafters of the Tribal Constitution wisely recognized such.

Next, the Court examines the laws enacted by Tribal Council. There are two (2) ordinances enacted by Tribal Council that apply to the instant matter. The *Law and Order – Criminal Offenses – Ordinance* details the territorial jurisdiction of the Tribe to include:

> *(1) "all land within the limits of the Tribe's reservation, including trust land, fee patented land and rights of way running through the reservation; and*
>
> *(2) all lands outside the boundaries of the Tribe's reservation held in trust by the United States for individual members of the Tribe or for the Tribe; and*
>
> *(3) all other lands considered 'Indian country' as defined by 18 U.S.C. section 1151 that is associated with the Tribe."* <u>See</u> Ordinance # 03-400-03.

The second ordinance is the *Criminal Procedures Ordinance* and it provides that: "[*T*]*he Tribal Court shall have jurisdiction over any action by any Indian as defined by this Ordinance, that is made a criminal offense under applicable Tribal Code and that occurred* **within the territorial jurisdiction of the Tribe as defined in the Constitution**" (bold added for emphasis by this Court). <u>See</u> Ordinance # 03-300-03, Section 8.08. **Tribal Council is obligated by the Tribal Constitution, as this Court is, to assert jurisdiction over the Tribe's territory.**

It is clear to this Court that the first of these two (2) Ordinances is unconstitutionally narrow in that it does not provide for the exercise of the inherent criminal jurisdiction over all tribal lands. As mentioned above, the Tribal Constitution requires that "[*t*]*he* **jurisdiction over its members and territory shall be exercised to the fullest extent consistent** with this Constitution, the sovereign powers of the Tribe, and federal law." <u>See</u> *Tribal Constitution*, Article I, Section 2. It is beyond dispute that Indian tribes have the inherent authority to mange [sic] their own affairs and domestic relations. **There is no federal limitation over the exercise of tribal criminal authority over crimes committed by Indians on land which is owned in fee by the Tribe.**

Opinion and Order Regarding Jurisdiction (Tribal Ct. App. Feb. 3, 2009) (docket no. 9 at pp. 6-10) (emphasis in original). Based on this reasoning, the Tribal Court of Appeals denied petitioner's motion for peremptory reversal and affirmed the Tribal Court's decision in its entirety "because the Tribe has criminal jurisdiction in the present matter." *Id.* (docket no. 9 at p. 11).

The Tribal Court of Appeals denied petitioner's motion for reconsideration. *See* Rulings on Appellant's Motion for Reconsideration and Alternative Request for Stay Pending Appeal (Tribal Ct. App. March 18, 2009) (docket no. 9 at pp. 12-14). In denying the motion, the Tribal Court of Appeals rejected petitioner's claim that federal law placed a limitation "on the exercise of the inherent criminal jurisdiction of this Tribe." *Id.* (docket no. 9 at p. 13). The Court observed in pertinent part:

> There are almost always exceptions to general rules. For example, the Ottawa and Chippewa of Michigan exercise treaty rights in areas outside of those that meet the federal "Indian country" definition. Tribes do have criminal jurisdiction over members who violate the criminal provisions of the applicable regulations. Like this treaty rights example of an exception to the general rule, the case before us is about tribal authority to enforce tribal standards on tribal activity **in its territory**. Appellant's argument that this is an infringement on the rights of the State of Michigan would be laughable, except it is so sad, because it completely ignores the history of the Tribe, the growth of the State around it, and that **all** of the interests in the present matters are tribal.

*Id.* (docket no. 9 at p. 13).

Ultimately, the Tribal Court of Appeals entered an order staying the proceedings upon receiving notice of the filing of the present federal habeas action. *See* Order for Stay (Tribal Ct. App. March 2, 2010) (docket no. 9 at pp. 22-23).

On November 5, 2009, petitioner filed present habeas action raising two issues:

I.      First Cause of Action: Unlawful Detention – Lack of Jurisdiction

        Does the Little River Band of Ottawa Indians have criminal
        jurisdiction over alleged criminal offenses occurring on tribally-
        owned, off-reservation fee lands?

II.     Second Cause of Action: Unlawful Detention – Violation of the
        Indian Civil Rights Act's Due Process Clause

        Can the Tribal Court of Appeals unexpectedly and indefensibly
        change the Band's criminal laws and apply those laws retroactively
        to the petitioner's detriment?

Pet. at ¶¶ 80-92 (Count I) and ¶¶ 93-102 (Count II); Petitioner's Brief (docket no. 2

at p. 14).

## II.     Jurisdictional Issue

Petitioner seeks habeas corpus relief from this court pursuant to 25 U.S.C. § 1303,

which provides that "[t]he privilege of the writ of habeas corpus shall be available to any person,

in a court of the United States, to test the legality of his detention by order of an Indian tribe."  He

first raises an issue of jurisdiction.

"Federal courts have long recognized that Indian tribes possess a unique legal status."

*Valenzuela v. Silversmith*, 699 F.3d 1199, 1202 (10th Cir. 2012), citing *Cherokee Nation v. Georgia*,

30 U.S. 1, 16–17, 5 Pet. 1, 8 L.Ed. 25 (1831).  "[I]ndian tribes are unique aggregations possessing

attributes of sovereignty over both their members <u>and their territory</u> [citing *Worcester v. Georgia,*

6 Pet. 515, 557 (1832) and *United States v. Kagama,* 118 U.S. 375, 381-382 (1886)] . . . . cases such

as *Worcester, supra,* and *Kagama* surely establish the proposition <u>that Indian tribes within "Indian</u>

<u>country"</u> are a good deal more than 'private, voluntary organizations.' "  *United States v. Mazurie*,

419 U.S. 544, 557 (1975) (emphasis added).  *See also, United States v. Lara,* 541 U.S. 193, 204

(2004).

11

> The status of the tribes has been described as an anomalous one and of complex character, for despite their partial assimilation into American culture, the tribes have retained a semi-independent position . . . not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided.

*White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980) (internal quotation marks omitted).

> Intrinsic in this sovereignty is the power of a tribe to create and administer a criminal justice system. 'An Indian tribe may exercise a complete (criminal) jurisdiction <u>over its members and within the limits of the reservation</u> subordinate only to the expressed limitations of federal law.' F. Cohen, Handbook of Federal Indian Law 148 (1942 ed. as republished by the University of New Mexico Press). The status of Indian tribes as dependent sovereigns with inherent but limited powers (which include the power to draft a constitution and to enact law) has been recognized by Congress. 25 U.S.C. § 476 (1970). (emphasis added)

*Ortiz-Barraza v. United States*, 512 F.2d 1176, 1179 (9th Cir. 1975). Thus, it is well-established that "criminal jurisdiction of the tribal courts is subject to substantial federal limitation." *Iowa Mutual Insurance Company v. LaPlante*, 480 U.S. 9, 15 (1987), as will be discussed more fully below.

Thus, although we speak in terms of "sovereignty" when discussing Indian jurisdiction, we do so mindful that since the American Revolution, federal and state jurisdiction over Indian matters has, despite some ebb and flow, become increasingly pervasive, more so in regard to criminal jurisdiction than civil. "[T]he sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treat or statute, <u>or by implication as a</u>

necessary result of their dependent status.  *See, Oliphant v. Suquamich Indian Tribe,* 435 U.S. 191 (1978)."  *U.S. v. Wheeler,* 435 U.S. 313, 323 (1978). (emphasis added)

Congress has broad general power to regulate Indian affairs which has consistently been described by the Supreme Court as "plenary and exclusive," *United States v. Lara, supra* at 200, subject only to a "rational basis" test that the proposed federal action be reasonably related to the federal duty to protect the welfare of Native Americans. *United States v. Doherty,* 126 F.3d 769 (6th Cir. 1997) at 778 and n.2, citing *Wheeler,* 435 U.S. 323 and *Morton v. Mancari,* 417 U.S. 535, 555 (1974).  In 1790, in an effort to protect Indians, Congress passed the first Indian Trade and Intercourse Act, 1 Stat. 137 (1799).  Sometimes referred to as the Non-Intercourse Act, the legislation established federal jurisdiction over non-Indians committing crimes against Indians in Indian territory. 1 Stat. 138 (1790).  It did not mention crimes committed by Indians. Twenty-seven years later, in 1817, federal jurisdiction was extended to cover crimes by both Indians and non-Indians against non-Indians in Indian Country, but crimes by Indians against Indians in Indian Country were left to tribal law.  3 Stat. 383.  That statute, as amended, is now codified at 18 U.S.C. § 1152 (known as the Federal Crimes Act or Indian Country Crimes Act).  Title 18 U.S.C. § 1152 provides that federal criminal jurisdiction extends to crimes occurring in Indian country, with some exceptions:

Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.  (emphasis added)

This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

Over the years, the federal government continued to press forward with its attempts to ensure the existence of criminal justice systems for the benefit of tribe members, but always with the understanding this was necessarily within Indian country or within the reservation. In 1885, Congress enacted the Major Crimes Act and moved to assert federal jurisdiction over 7 major violent crimes committed by Indians in Indian Country, regardless of whether the victims were Indians or non-Indians. 18 U.S.C. § 1153. This act insured that Indian defendants charged with these crimes would be subject to the same laws and punishments as those persons charged in the state and federal courts. They would also be afforded all the procedural protections of a federal trial court. 18 U.S.C. § 3242.

The number of covered crimes covered by 18 U.S.C. § 1153 eventually doubled. § 1153 now protects Indians from violent offenses committed by other Indians in Indian country as follows:

(a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnaping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States. (emphasis added)

(b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

This constituted a substantial and systematic intrusion into the sovereignty of the tribes.[3]  In *United*

---

[3]Another example of federal law limiting tribes' criminal jurisdiction over Indians was the establishment of the Courts of Indian Offenses.

> "Courts of Indian Offenses are established pursuant to regulations promulgated by the Bureau of Indian Affairs (BIA) . . . Because the courts are established and governed by regulations published in the Code of Federal Regulations, they are commonly referred to as 'CFR courts.'"

*Tillett v. Lujan*, 931 F.2d 636, 638 (10th Cir.1991).  *See, Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, n. 7 (1978) ("The CFR Courts are the offspring of the Courts of Indian Offenses, first provided for in the Indian Department Appropriations Act of 1888, 25 Stat. 217, 233.  *See W. Hagen, Indian Police and Judges* (1966)).  By regulations issued in 1935, the jurisdiction of CFR courts is restricted to offenses committed by Indians within the reservation.").  *See also, Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 64 n. 17 (1978) ("Courts of Indian offenses were created by the Federal Bureau of Indian Affairs to administer criminal justice for those tribes lacking their own criminal courts.").

CFR courts are established "to provide adequate machinery for the administration of justice for Indian tribes in those areas of Indian country where tribes retain jurisdiction <u>over Indians</u> <u>that is exclusive</u> <u>of State jurisdiction</u> but where tribal courts have not been established to exercise <u>that</u> jurisdiction." (emphasis added) 25 C.F.R. § 11.102.  Where CFR courts have not been supplanted by independent tribal courts, they "function as tribal courts; they constitute the judicial forum through which the tribe can exercise its jurisdiction until such time as the tribe adopts a formal law and order code." *Id.* at 640.  As one tribal court of appeals explained:

> "It is generally conceded that only Congress can create federal courts. U.S. CONST. art. I, sec. 8, cl. 9.  Congress did not enact specific legislation creating the Courts of Indian Offenses or CFR courts.  Courts of Indian Offenses or CFR courts were in their early histories mere administrative creations of the Interior Department to bring law and order to Indian Country.  But today these courts no longer can be categorized at such, and in fact have been acknowledged to operate under the residual sovereignty of the tribes as well as under the authority of the federal government."

*Kiowa Election Board v. Lujan*, 1 Okla. Trib. 140, 150-51, 1987 WL 382994 at *3 (Kiowa 1987).

Notably, CFR courts or Courts of Indian Offenses are considered "Indian courts" for purposes of the Indian Civil Rights Act.  *See* 25 U.S.C. § 1301(3) (" 'Indian court' means any Indian tribal court or court of Indian offense").  The federal regulations establishing CFR courts limited the courts' jurisdiction over Indians to offenses that occurred within Indian Country.  *See* 25 C.F.R. § 11.100(a) ("Unless indicated otherwise in this title, these Courts of Indian Offenses are established and the regulations in this part apply to the Indian country (as defined in 18 U.S.C. 1151 and by Federal court precedent) occupied by the following tribes . . .").  The regulations further limited the court's criminal jurisdiction to Indian country. *See* 25 C.F.R. § 11.114(a) ("Except as otherwise provided in this title, each Court of Indian Offenses has jurisdiction over any action *by an Indian* (hereafter referred to as person) that is made a criminal offense under this part *and that occurred within the Indian country* ") (emphasis added).  In this regard, the court notes that the agency specifically used the term "Indian country" to describe the CFR courts' criminal

*States v. Kagama,* 118 U.S. 375 (1886), the Supreme Court upheld the plenary power of Congress to enact the Major Crime Act, even over the opposition of tribes affected, because of the dependent status of the tribes as wards of the federal government. However, in the absence of federal law limiting criminal jurisdiction by tribal courts over Indians in Indian country, tribal authority is inherent. *Ex parte Crow Dog,* 109 U.S. 556 (1883). The principle of *Ex Parte Crow Dog* remains good law today. *See United States v. Lara,* 541 U.S. 193 (2004). But a reading of both *Crow Dog* and *Kagama*, which explicate the principle of the inherent authority of tribes over their members, makes it equally clear that the principle was being expressed wholly in the context of Indian country.[4]

Situations to the contrary are unusual and unique. "The jurisdiction of a tribe is generally confined to crimes committed within the geographical limits of its reservation and, presumably, any of its dependent Indian communities.[[5]] One exception to this rule was established in *Settler v. Lameer,* 507 F.2d 231 (9th Cir. 1974), in which the Yakima tribal court was held to have jurisdiction to punish tribal members who committed game violations in exercise of their off-reservation treaty fishing rights. Certain cases of juvenile delinquency also appear to be an exception

jurisdiction when issuing revised regulations in 1993, the BIA. *See* 58 FR 54406-01, 1993 WL 420575 at *54406 (Oct. 21, 1993) ("The term 'Indian country' is used instead of 'reservation' in describing the jurisdiction of Courts of Indian Offenses for consistency with federal jurisdictional statutes").

[4]Although the tribes have continued to exercise inherent jurisdiction over Indians committing offenses in Indian country, 25 U.S.C. § 1301(2), to the extent that tribes have attempted to exercise jurisdiction over non-Indians committing crimes within Indian country as an "inherent" right of tribal self-government, they have been rebuffed. In *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191 (1978), the Supreme Court held that as dependent nations, the tribes lacked criminal jurisdiction over non-Indians. Any inherent tribal criminal jurisdiction was limited to crimes committed by Indians.

[5]The Supreme Court has held that "dependent Indian communities" are defined by two essential characteristics: the land must be set aside for the use of Indians and the land (not merely the tribe) must be under the superintendence of the federal government. *Alaska v. Native Village of Venetie Tribal Government,* 522 U.S. 520 (1998).

to the general rule, but in fact are not. When an Indian juvenile domiciled on a reservation commits criminal acts off-reservation, the tribal court generally exercises jurisdiction to adjudicate delinquency. The reason is that the matter in issue is the status of delinquency, with a locus on the reservation, and not the individual acts committed off-reservation." *American Indian Law In A Nutshell,* 4th ed. Hon. William C. Canby Jr., Thomson - West 2004, at 175.

Congress has further restricted the inherent authority of Indian tribes by limiting the means by which their authority is exercised. In the Indians Civil Rights Act of 1968 (ICRA), 28 U.S.C. § 1301, *et seq.,* Congress imposed on the tribes most of the requirements found in the Bill of Rights, including the right of review in this court by habeas corpus. The statute also capped the maximum sentence a tribal court could impose. Thus, while the criminal jurisdiction of tribes to punish its own is "inherent," it has been substantially altered and corralled by federal statute. Subject to those protections, adopted by Congress in derogation of the authority of the tribes, this court has recognized that "Indian tribal courts have jurisdiction over crimes committed in Indian Country by tribe members and other Indians." *United States v. Doherty,* 902 F.Supp. 773 (W.D. Mich. 1995), *aff'd.* 126 F.3d 769 (6th Cir. 1997) (emphasis added).

In summary, where originally Indian tribes' right of self-government and their right "to administer justice among themselves after their rude fashion, even to the extent of inflicting the death penalty, [had] never been questioned; and . . . the government [had] carefully abstained from attempting to regulate their domestic affairs, and from punishing crimes committed by one Indian against another in Indian Country," *see,* S.Rep. No. 268, 41st Cong., 3d Sess., 10 (1870), today the maximum penalty an Indian tribe can impose against one of its own is limited to nine years, 25 U.S.C. § 1302(a)(7)(D), and that is only if the Tribal Court affords the Indian defendant a plethora

of due process protections similar to those guaranteed by the United States Constitution. Congress, in the exercise of its plenary rights over the Indian tribes, has moved from its 1870 position, where it recognized the tribes' right "to administer justice among themselves" in Indian Country, "even to the extent of inflicting the death penalty," *id.,* to the position it takes today in requiring that, if a tribe is going to punish any Indian for committing crimes in Indian Country, it will be limited to imposing a maximum term of years decided by Congress (obviously foregoing the death penalty), and it will have to accord an Indian defendant the rights Congress, not the tribes, has decreed are necessary.

Petitioner's argument is that his offense was committed at the Tribal Community Center, which is property owned by the Tribe but outside of the reservation boundaries, and therefore the offense was committed outside the tribe's limited criminal jurisdiction. In fact, it is undisputed in this case that the Community Center is not on land considered 'Indian Country' as defined by 18 U.S.C. § 1151,[6] which includes land held in trust by the United States for individual members of the Tribe or for the Tribe.[7] Specifically, petitioner contends that the Tribe does not have

---

[6]"Respondent assumes for purposes of this litigation, as did the Tribal Court of Appeals, that the Community Center does not come within the Tribe's Indian Country." Answer of Respondent at p.2, and p. 6, n. 4 (docket no. 13).

[7]For purposes of this report, the term "Indian Country" is defined as including a tribe's reservation, trust, and allotment lands. *See* Answer of Respondent at 1. "Fee land or fee-owned land" is used to refer to property owned by a tribe outside of Indian Country, such as the Tribe's Community Center. "Federal law recognizes that Indian tribes may hold certain lands in fee simple and that these lands may not be subject to the trust relationship between Indian tribes and the Federal Government. *See, e.g.,* 25 U.S. C. § 1466." *Penobscot Indian Nation v. Key Bank of Maine,* 112 F.3d 538, 546 (1st Cir. 1997). The court construes the Tribe's ownership of property in fee simple to be that as defined by Michigan law. *See* M.C.L. § 554.2 ("Every estate of inheritance shall continue to be termed a fee simple, or fee; and every such estate, when not defeasible or conditional, shall be a fee simple absolute, or an absolute fee"); *Eastbrook Homes, Inc. v. Treasury Department*, 296 Mich. App. 336, 348, 820 N.W.2d 242 (2012) ("A person having all possible rights incident to ownership of a parcel of property has the entire bundle of sticks or a fee simple title to the property").

power under federal Indian law to exercise criminal jurisdiction on fee lands owned by the Tribe which have never been part of a reservation, allotment, or dependent Indian community. Petitioner's Brief at p. 14.

The Tribal Court of Appeals' decision at issue in this habeas proceeding determined that the Tribe has the inherent power to exercise criminal authority on *any* real estate which it owns, noting that "[a]fter diligent research of authorities, this Court cannot find any federal limitation over the exercise of tribal criminal authority over crimes committed by Indians on land which is owned in fee by the Tribe." Having found no federal limitation, the Tribal Court of Appeal then concluded in unequivocal terms that there was none: "There is no federal limitation over the exercise of tribal criminal authority over crimes committed by Indians on land which is owned in fee by the Tribe." The Tribal Court of Appeals reasoned that the "Tribal Council is obligated by the Tribal Constitution, as this Court is, to assert jurisdiction over the Tribe's territory [i.e., the Community Center]." Opinion and Order Regarding Jurisdiction (Tribal Ct. App. Feb. 3, 2009) (emphasis omitted).

The Tribal Constitution was adopted in 1998 in accordance with the Indian Reorganization Act of June 18, 1934, as amended. *See* Preamble to the Tribal Constitution. In the constitution, the Territory of the Little River Band of Ottawa Indians is described as "all lands which are now or hereinafter owned by or reserved for the Tribe," as well as "all lands which are now or at a later date owned by the Tribe or held in trust for the Tribe . . .". The Tribal Court of Appeals

read these provisions to encompass lands it "owns in fee" as well as land normally understood to be Indian Country (i.e., reservations and trust lands).[8]

The Tribal Constitution also distinguishes the concept of jurisdiction from that of territory, providing in Article I, § 2, entitled *Jurisdiction Distinguished from Territory,* only that "[t]he Tribe's jurisdiction over its members and territory should be exercised to the fullest extent consistent with . . . federal law." The Tribal Court of Appeals acknowledges "that tribal jurisdiction is not synonymous with its territory," Tribal Court of Appeals Opinion and Order, *supra,* and does not dispute that the Tribe's ability to exercise criminal jurisdiction is subject to federal law.

The Tribal Court of Appeals' analysis takes as its beginning point the "inherent authority of the tribes [to] manage their internal affairs." The appellate tribal court recognizes, as it must, that the Tribe's jurisdiction over its members and territories is to be exercised to the fullest extent consistent with "[the tribal] Constitution, the sovereign powers of the Tribe, and <u>federal law</u>." *Id.* (emphasis added). Having said that it searched for and found no federal limitation over the exercise of tribal criminal authority over crimes committed by Indians on land which is owned in fee by the Tribe, the Tribal Court of Appeals concludes that there is no federal impediment to the tribal constitution, which otherwise provides for, indeed mandates, tribal criminal jurisdiction over land owned in fee by the tribe.

To say that there is no federal impediment to asserting tribal criminal jurisdiction over fee-owned land, however, is to ignore the elephant in the middle of the room. It is understood,

---

[8]The provision appears redundant when read this way, since each clause contains the same words "owned by". These two clauses might as easily be read as all-encompassing language referring, first, to reservation land, and second, to trust land. This is not only consistent with the concept of Indian Country, but may well be the way the drafters of the tribe's "Law and Order-Criminal Offenses-Ordinance" understood these two clauses in the Tribal Constitution when they subsequently drafted that ordinance. Nevertheless, this court will defer to the Tribal Court of Appeals' construction of its own constitution.

of course, that Indian tribes have power to enforce their criminal laws against tribe members, and that their right of internal self-government includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions. *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079 at 1085-86 (1978). Before the coming of the Europeans, the tribes were self-governing sovereign political communities, and like all sovereign bodies, they had the inherent power to prescribe laws for their members and to punish infractions of those laws. *Id.* Thus, the source of their authority came not from the federal constitution or by powers delegated to it by Congress, but was inherent. That being said, it is equally true that Indian tribes are no longer possessed of those same attributes of sovereignty. The incorporation of the tribes within United States territory, and their acceptance of its protection, necessarily divested them of significant aspects of the sovereignty which they had previously exercised. It cannot be gainsaid but that over the years Congress has, with much evident deliberation and purpose, severely circumscribed the "sovereignty" of the tribes where criminal justice is concerned, as amply demonstrated above. Thus, it is unquestioned that Indian tribes are subject to ultimate federal control.

Indeed, the very tribal constitution upon which the Tribal Court of Appeals relies was adopted pursuant to a federal statute. *See Preamble, supra.*

Thus, the issue is, to what extent tribes have been divested of their sovereignty.

In its February 3, 2009 opinion, the Tribal Court of Appeals determined that the Tribal Community Center "has been the center of Tribal community activities ever since it was purchased by the Tribe many years ago." Nevertheless, the Tribal Community Center did not fall within the Tribe's own territorial definition as spelled out in its criminal ordinance. *See* Law and Order – Criminal Offenses – Ordinance, § 4.03(a), *supra,* (limiting the Tribe's criminal territorial

jurisdiction to the reservation, lands outside of the boundaries of the reservation held in trust by the United States for individual members of the Tribe or the Tribe, and land defined as Indian country under 18 U.S.C. § 1151[9] that is associated with the Tribe.) This is revealing, because apparently even the Tribe Council itself, when it was enacting this foundational document, did not believe its criminal jurisdiction extended outside these boundaries.

Faced with this obstacle of the Tribe's own making, the Tribal Court of Appeals held that the Tribe's ordinance was an "unconstitutionally narrow" exercise of the Tribe's authority under its constitution. The court felt the ordinance should have been written to extend the Tribe's jurisdiction to all property which the Tribe owned, even if it was not part of its reservation or otherwise defined as Indian country. Tribal Court of Appeals Opinion (Feb. 3, 2009). The court's ruling, by judicial fiat, did just that. Respondent has not cited any federal statute or treaty provision which grants the Tribe the authority, either legislatively or by judicial fiat, to extend its criminal jurisdiction to a building owned outside of the reservation or Indian country boundaries. Rather, the Tribal Court of Appeals analogized its authority over the Tribal Community Center to a tribe's ability to enforce regulations related to treaty rights which occur off the reservation.[10]

_____

[9]Title 18 U.S.C. § 1151 defines "Indian country" as follows:

Except as otherwise provided in sections 1154 and 1156 [] of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

[10] "For example, the Ottawa and Chippewa of Michigan exercise treaty rights in areas outside of those that meet the federal "Indian country" definition. Tribes do have criminal jurisdiction over members who violate the criminal provisions of the applicable regulations." Tribal Court Appeals, March 18, 2009 (docket no. 9 at 13).

As previously mentioned, courts have recognized that a Tribe has the authority to enforce regulations outside of Indian country where specific treaty rights permit such enforcement. *See, e.g., Settler v. Lameer*, 507 F.2d 231, 238 (9th Cir. 1974) (Yakima Indian Nation had the authority to arrest and prosecute tribal members for violation of the Tribal fishing regulations that occurred off the reservation, "where the regulation of these activities with respect to off-reservation fishing is within the scope of the rights retained by the Yakima Nation in the Treaty of 1855"); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 668 F.Supp. 1233, 1241 (W.D. Wis. 1987) ("the plaintiff tribes possess the authority to regulate their members in the exercise of treaty usufructuary rights off the reservation"); *United States v. State of Michigan*, 471 F.Supp. 192, 274 (W.D. Mich. 1979), *modified in part* 653 F.2d 277 (6th Cir. 1981) ("Both Bay Mills' and the Sault Tribe's treaty rights include the power to regulate their members so long as they are fishing under tribal regulation and in the area ceded by the Treaty of 1836"). The significant distinction in this instance, however, is that the Tribal Court of Appeals fails to identify any such analogous treaty right applicable to its property outside of Indian Country. [11]

---

[11]In reaching its decision, the Tribal Court of Appeals relies heavily on the circumstances surrounding the offense. Admittedly taking place only on fee land, the Tribal Court of Appeals held that the "interests of the Tribe are very strong here." The Tribal Court of Appeals pointed out in a somewhat redundant manner that the perpetrator was a tribal member in an elected position, acting as an agent of the Tribe, at a tribal activity, who committed the offense against a tribal employee, in a public setting generally visible to other employees and tribal members, and that defendant exercised political influence affecting the victim and the Tribe's welfare. It is also undisputed that the Community Center was a center for tribal activity. The Tribal Court of Appeals, in the words of respondents, upheld "the Tribe's criminal jurisdiction over petitioner based on his membership status and the effect of his crime on the Territory's internal affairs, as demonstrated by the nature and location of the crime, . . ." Answer of Respondent, p. 14.

As useful as these facts may be in establishing one of the **elements** of the offense (i.e., that the defendant be in a position of authority over the victim and use this authority to coerce the victim to submit; see Count I), the issue before the court is **jurisdiction.** The basis of jurisdiction cannot be a moving target based on the number of factors a prosecutor can name. *Query:* What if defendant had not been in an elected position at the time, but did exercise political influence; or had been an elected official who was not attending a tribal activity; or who did not act out in a public setting; would there still be jurisdiction? The possible permutations are endless. While the Tribal Court of Appeals may feel tribal elected representatives ought

It has usually been assumed that state courts properly exercise criminal jurisdiction over Indians who commit crimes outside of Indian country. *Hagen v. Utah*, 510 U.S.399, 401-02 (1994) (citing 18 U.S.C. § 1151). "It is also well established . . . that States have criminal jurisdiction over reservation Indians for crimes committed (as was the alleged poaching in this case) off the reservation." *Nevada v. Hicks*, 533 U.S. 353, 362 (2001). "An offense committed by an Indian outside the territorial confines of an Indian reservation was within state criminal jurisdiction." *Robinson v. Wolff* , 349 F.Supp. 514, 521 (D. Neb. 1972), citing *DeMarrias v. State of South Dakota*, 319 F.2d 845 (C.A. 8th Cir. 1963). *See Fife v. Moore*, 808 F.Supp.2d 1310, 1314 (E.D. Okla. 2011) ("crimes committed by Native Americans outside the territorial boundaries of Indian country are subject to state criminal prosecution"), and a subsequent unpublished order in *Fife v. Moore*, No. 6:11-cv-133 (Sept. 8, 2011) concluding that a tribal court did not have jurisdiction over offenses that were committed on land owned by the tribe but not within Indian Country.[12]

In those few cases where an Indian has committed an offense on fee land, the law does not support respondent's position. The order of September 8, 2011 in *Fife, supra,* is particularly instructive. Like the present case, this matter came before the district court on a petition for a writ of habeas corpus pursuant to 25 U.S.C. § 1303. Petitioners were members of the Muscogee (Creek) Nation who had been charged with theft on fee land, rather than trust land. Petitioners argued that the tribal court lacked jurisdiction. The Eastern District of Oklahoma agreed.

---

to be held to a higher standard, its chastisement of petitioner does not establish jurisdiction where it does not otherwise exist.

[12] A copy of this unpublished order appears in the court record as docket no. 32-2.

The Oklahoma District Court was willing to recognize the proposition that "'[a]n Indian tribe's power to punish members who commit crimes <u>within Indian country</u> is a fundamental attribute of the tribe's sovereignty,'" (emphasis added) quoting the Eighth Circuit in *Walker v. Rushing,* 898 F.2d 672, 674 (1990). But the court in *Fife* was not willing to treat the highlighted phrase as extraneous, thereby giving the tribe's power to punish an extra-territorial effect. *Id.*

In further support of its position, the Oklahoma court pointed to the W. LaFave treatise, *Substantive Criminal Law* § 4.5, text at n.56 (citing *Hagen v. Utah,* 510 U.S. 399 (1994)), which posited that states have general criminal jurisdiction over all persons, including Indians, regarding crimes committed within a state but outside of Indian country. This, the Oklahoma federal court noted, seemed contrary to the principle of extra-territoriality. Further, the court observed:

> "'[b]asic federal Indian policy generally has favored separating Indians on their own lands that are designated as Indian country; therefore, preemption of state laws outside of Indian country, has not been extensive,' Cohen*, Handbook of Federal Indian Law* (1982 ed) at 348.
>
> Thus, under this view, 'if a tribal member commits a crime outside Indian country, the state has jurisdiction.' Sarah Krakoff, *A Narrative of Sovereignty: Illuminating the Paradox of the Domestic Dependent Nation,* 83 Or. L. Rev. 1109, 1186 (2004). *See also* Samantha A. Moppett, *Acknowledging America's First Sovereign: Incorporating Tribal Justice Systems into the Legal Research and Writing Curriculum,* 35 Okla. City U. L. Rev. 267 at n.229 (2010)("Tribal courts do not have jurisdiction over crimes that are not committed on Indian land." (citing Canby, <u>American Indian Law in a Nutshell</u> at 175 (4th ed. 2004))." (footnote omitted)

*See also Steffler v. Belleque*, No. 3:09-cv-01371,  2013 WL 182873 at \*9 (D.Or. Jan. 17, 2013)

("Petitioner has cited no case interpreting the language of the Cow Creek Treaty, or any similar treaty, to deprive a state of jurisdiction over crimes committed by an Indian outside Indian Country. This failure is especially significant in light of the well established rule that States generally have criminal jurisdiction over crimes committed off the reservation"), citing *Mescalero Apache Tribe*

25

*v. Jones*, 411 U.S. 145, 148–49 (1973); *Nevada v. Hicks*, 533 U.S. 353, 362 (2001); *Organized Village of Kake v. Egan*, 369 U.S. 60, 75 (1962).

These cases are consistent with the usual understanding of tribal jurisdiction.  Justice Blackmun sets forth these commonly understood principles in pertinent part in *Hagen v. Utah, supra*, (preparatory to explaining a dissent on an unrelated issue):

> During the 19th Century, land was considered Indian country and thus subject to tribal jurisdiction 'whenever the Indian title had not been extinguished.'  *Bates v. Clark,* 95 U.S. 204, 208 (1877).  In passing the General Allotment Act of Feb. 8, 1887, 24 Stat. 388, and related statutes, Congress no doubt assumed that tribal jurisdiction would terminate with the sale of Indian lands and that the reservations eventually would be abolished.  *See Solem,* 465 U.S., at 468.  The General Allotment Act itself did not terminate the reservation system, however, but was intended to assimilate [footnote omitted] the Indians by transforming them into Agrarians and opening their lands to non-Indians.  *See Mattz,* 412 U.S., at 496.  After this goal of the allotment policies proved to be a disastrous failure, [footnote omitted] Congress reversed course with the passage of the Indian Reorganization Act of 1934, 48 Stat. 984, as amended, 25 U.S.C. § 461 *et. seq.* (1988 ed and Supp. IV), which allowed surplus-opened Indian lands to be restored to tribal ownership.  Finally, in 1948, Congress resolved the ensuing jurisdictional conflict **by extending tribal jurisdiction to encompass lands** owned by non-Indians **within reservations boundaries.**  *See* Act of June 25, 1948, 62 Stat. 757 (codified at 18 U.S.C. § 1151 (defining "Indian Country" as including "all lands within the limits of any Indian reservation under the jurisdiction of the United States government").  [FN 6] **Reservation boundaries, rather than Indian title, thus became the measure of tribal jurisdiction.**
>
> > [FN 6: Congress' extension of tribal jurisdiction to reservation lands owned by non-Indians served pragmatic ends.  "**[W]**here the **existence** or non-existence of an Indian reservation, and therefore the existence or non-existence of **federal jurisdiction, depends upon the ownership of particular parcels of land, law enforcement officers** operating in the area **will find it necessary to search track books in order to determine whether the criminal jurisdiction over each offense . . . is in the State or Federal Government. Such an impractical pattern of checkerboard jurisdiction was avoided by the plain language of § 1151.** *Seymour v. Supt. of Wash. State Penitentiary,* 368 U.S. 351, 358 (1962) (footnote omitted).] (emphasis added)

Of course, the same 'checkerboard jurisdiction' conundrum, avoided by the plain language of § 1151 within the reservation, would, by the reasoning of the Tribal Court of Appeals, find new life outside of Indian country.

Accordingly, this court disagrees with the Tribal Appeal Court's view that the Tribe's criminal jurisdiction over its members is co-extensive with any real estate the Tribe may own or decide to purchase on the open market outside Indian country. The position taken by the Tribal Court of Appeals is particularly disingenuous. For over two centuries, Congress has labored to exercise its plenary authority over Indian matters in Indian Country, substantially curtailing the authority of the criminal authority of the tribes both as to non-Indians and Indians alike. The law pertaining to Indian criminal jurisdiction, while not without confusion over the years, is replete with statutes and cases limiting that jurisdiction. Nor is the power of Congress to limit tribal court jurisdiction in doubt. *Iowa Mutual Insurance Co.v. LaPlante,* 480 U.S. 9, 17 (1987), citing *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56 (1978), "Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess." *See generally,* F. Cohen, Handbook of Federal Indian Law, 207-216 (1982). The Tribe's own constitution recognizes that the Tribe exercises its jurisdiction only to the extent that it is consistent with federal law. Thus the sovereignty of the tribes is but sovereignty as Congress is given to see that sovereignty.

Yet, despite this extensive congressional history, to accept respondent's argument, it would appear that the extent of tribal jurisdiction is not measured by the definition of Indian country after all, but follows the path of the tribe. And should some wanderlust cause the tribe to migrate elsewhere, perhaps to purchase a high rise apartment complex in Detroit, or a restaurant in

a shopping mall in Flint, or a retirement home in Lansing, tribal members attendant to these properties would be subject to the tribe's criminal justice system in addition to the state and federal criminal systems. To simply state this premise is to highlight its implausibility. This would not only be an inconsistent policy, but would be counter-intuitive as well. It is inconceivable that Congress overlooked such an anomaly, regulating tribal jurisdiction Indian country closely for these past two centuries, while leaving the tribes free to assert criminal jurisdiction outside Indian Country.

The better and only logical answer to this conundrum is that Congress has not recognized the tribe's rights to exercise plenary criminal jurisdiction over their members or other Indians outside of Indian Country, where state law and state courts already provide adequate criminal justice systems, at least since the days of *Crow Dog* and *Kagama,* which spelled out the dependent nature of their status. This is, "by implication," a necessary result of their dependent status, *see, United States v. Doherty,* 126 F.3d at 778. As a result of their incorporation within the territory of the United States and their acceptance of its protection, the scope of their territorial sovereignty has been limited to Indian Country, and with the acceptance of that status they have necessarily relinquished the unfettered sovereignty they exercised prior to the coming of the Europeans. *See United States v. Wheeler* at 1086. While recognizing the source of their authority is inherent, it is unquestioned that their sovereignty is of a limited character existing only at the sufferance of Congress and is subject to complete defeasance. Congress has repeatedly addressed the issues of sovereignty, and in recent years has carefully fashioned the parameters of a criminal justice system that carefully balances the interests of the tribes and self-government against the protections that must necessarily be afforded to Indian criminal defendants "to protect the welfare of Native Americans," *see Morton, supra,* at 535, within Indian Country.

Putting everything into perspective, the inescapable conclusion for this court is that when the tribes were incorporated within the territory of the United States, and accepted the protection of the United States, in the form among other things of protected Indian Country, they became dependent entities. The necessary result of their dependent status was, by implication, that they forsook the extensive sovereignty they had enjoyed before there existed an 'Indian Country.' This trade-off (fair or unfair as it may have been) resulted in an exchange of unlimited freedom for the federal protections of Indian Country. Indeed, the implications of this exchange have been so clear to this point as to brook no suggestion otherwise, which may explain the dearth of case law on this topic. A contrary result would be totally inconsistent with two centuries of Congress' purpose and without rational explanation.[13]

For these reasons, the court concludes that the Tribal Court is, and was, without jurisdiction over petitioner in this matter.

---

[13]To subject someone to criminal prosecution is to invoke the 'power of the state,' whether it be the State of Michigan exercising its criminal jurisdiction within the boundaries of the State of Michigan, the federal government within its jurisdiction as a sovereign nation, or an Indian tribe within its jurisdiction which is generally perceived to be Indian Country. Criminal justice, unlike the resolution of civil disputes, is reserved 'to the state,' not only because of the costs and obligations it imposes on the coffers of the state, but also because we want to remove from the hands of private individuals the question of punishing crime, to eliminate, for example, vigilante justice and family vendettas. For these reasons, most of the cases cited by the parties discussing the scope of tribal sovereignty in civil matters provide little guidance.

But the exercise of criminal jurisdiction by these governmental entities normally comes with recognized territorial restrictions. The State of Michigan, for example, does not attempt to punish assaults committed by its residents on other Michigan residents which occur outside of Michigan, say, for example in Wyoming or Louisiana. The opinion of the Tribal Court of Appeals would expand the reach of tribal criminal jurisdiction to private property the tribe purchases outside the confines of Indian Country, and without the consent of the State of Michigan or the federal government. A tribe's affluence may enable it to buy private property throughout the United States, for whatever purpose it may choose, but a tribe cannot by such a private transaction unilaterally extend its criminal jurisdiction – a governmental function – over land where another governmental entity (e.g., Michigan) has a fully functioning criminal justice system in place and operating and has not ceded any of its criminal jurisdiction. This is so, notwithstanding the tribe's protestations that it does not seek to extinguish state law enforceable on Indian fee-owned land – a right respondents do not claim.

### III. Due Process Violation in Retroactive Construction of Criminal Offense Ordinance

Petitioner also contends that the Tribe cannot re-write its own Tribal Law and Order Codes to encompass an offense that was not punishable by the Tribe when petitioner allegedly committed the crime in 2005. Brief at p. 14. Petitioner contends that respondents have violated his due process rights under the Indian Civil Rights Act, 25 U.S.C. § 1302 (Constitutional rights) which at the time of petitioner's conviction in 2007, provided in pertinent part:

> No Indian tribe in exercising powers of self-government shall . . . (8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law . . .

25 U.S.C. § 1302 (8).[14]

It is petitioner's argument that the Tribal Court of Appeals cannot retroactively expand the reach of the Tribe's criminal laws, after the offense was committed. Specifically, petitioner contends that after the incident the Tribe changed its criminal laws by making a new class of conduct punishable by the Tribal Court, i.e., crimes occurring on off-reservation fee land. Pet. Brief at p. 42. Petitioner contends that this violated 25 U.S.C. § 1302(8) because it denied him due process. *Id.*

Respondent admits that this due process issue was not addressed in the Tribal Court of Appeals. Indeed, as discussed in § I, *infra*, the only issue addressed by the Tribal Court of Appeals was petitioner's jurisdictional claim. It is equally evident that prior to the decision by the Tribal Court of Appeals, the tribe's Law and Order-Criminal Offenses Ordinance did not extend the

---

[14] The court notes that § 1302 was amended in 2010. *See* Pub. L. 111-211, 124 Stat. 2279. This court will apply the version of the statute in effect at the time of petitioner's conviction. *See, e.g., Valenzuela v. Silversmith*, 699 F.3d 1199, 1203, n. 1 (10th Cir. 2012) (applying version of § 1302 in effect at the time of the petitioner's conviction).

territorial jurisdiction of the Tribe to the Community Center. The Tribal Court of Appeals did this by judicial fiat after the fact. (It was precisely this question of jurisdiction that the Oklahoma District Court in *Fife v. Moore, supra,* found should be resolved prior to a tribal member being subjected to criminal process.) In the present case, the court notes that the Tribal Court of Appeals was only able to provide a uniform definition of the Tribe's jurisdiction which could be made applicable to this prosecution after the conviction occurred, and then only after it ruled that the Tribe's ordinance defining its own jurisdiction was unconstitutionally narrow, and expanded it. As the ordinance was written at the time of trial, and at the time of the offense, jurisdiction did not reach petitioner. Nor can it be said at that time, based upon the language of the ordinance, that petitioner was legally on notice that the tribe considered him to be subject to the criminal jurisdiction of tribe when he was on the grounds of the Community Center.

No purpose would be served in sending this case back to the Tribal Court of Appeals to address this issue, which it certainly had an opportunity to consider, because the Tribal Court of Appeals cannot cure the ex post facto nature of its decision without granting petitioner the relief he seeks, which it has declined to do. Any further attempt at exhaustion would be futile.

## IV.    Recommendation

For the reasons discussed above, I find the Tribe's criminal jurisdiction did not extend to the Community Center, which was on fee land not within Indian Country. Further, while I do not believe the Tribe could have expanded its criminal jurisdiction to include this fee land, I further find it would have been a violation of the due process provided for in the former 25 U.S.C. § 1302(8) to have done so retroactively, as the Tribal Court of Appeals attempted to do in this case. Therefore, I respectfully recommend that the petition for a writ of habeas corpus based on a lack of

jurisdiction be **GRANTED** and that the charge of Sexual Assault in violation of the Tribal Ordinance be **DISMISSED** with prejudice.

Dated:  November 7, 2013                             /s/ Hugh W. Brenneman, Jr.
                                                     HUGH W. BRENNEMAN, JR.
                                                     United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).